STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2023 CA 0092

KEITH L. YOUNG

VERSUS

SMITTY'S SUPPLY, INC.

Judgment Rendered:  **SEP 29 2023**

* * * * *

On Appeal from the
The Office of Workers' Compensation, District 6
In and for the Parish of St. Tammany
State of Louisiana
No. 20-04460

The Honorable Diane Lundeen, Workers' Compensation Judge Presiding

* * * * *

Brent Michael Steier                        Attorney for Plaintiff/Appellee
Baton Rouge, Louisiana                  Keith L. Young

Frank R. Whiteley                           Attorneys for Defendant/Appellant
Robert J. May                                  Smitty's Supply, Inc.
New Orleans, Louisiana

* * * * *

**BEFORE: WELCH, HOLDRIDGE, AND WOLFE, JJ.**

Wolfe J agreeing in part and dissenting in part with reasons assigned

**HOLDRIDGE, J.**

In this workers' compensation case, the employer, Smitty's Supply, Inc. (Smitty's), appeals a judgment awarding the employee, Keith L. Young, supplemental earnings benefits (SEBs), medical benefits, and penalties and attorney's fees. Mr. Young has answered the appeal seeking the additional attorney's fees that he incurred for the appeal. For the following reasons, we reverse in part and affirm in part, and we deny the answer to the appeal.

## FACTS AND PROCEDURAL HISTORY

On March 24, 2020, Mr. Young was in the course and scope of his employment with Smitty's when he suffered a work-related accident. According to Mr. Young, he slipped and fell on the floor, injuring his right shoulder. Mr. Young filed a workers' compensation claim against Smitty's on July 23, 2020. He sought to recover medical benefits, indemnity benefits, and penalties and attorney's fees due to the denial of his claims for indemnity and medical benefits. Smitty's answered Mr. Young's claim on August 13, 2020, admitting that Mr. Young worked at Smitty's at the time of the alleged accident, but denying all of his other claims.

The trial was held on March 22, 2022, and June 28, 2022. The workers' compensation judge (WCJ) issued written reasons for judgment and signed a judgment in accordance with those reasons on September 20, 2022. The WCJ found that Mr. Young sustained an accident in the course and scope of his employment and that his injuries from the accident required medical care. The WCJ ordered Smitty's to pay for the MRI of Mr. Young's right shoulder and the right shoulder surgery he underwent. Additionally, the WCJ ordered Smitty's to pay Mr. Young's outstanding medical bills totaling $15,983.08 to specific medical service providers and to reimburse Mr. Young $7,246.42 for the medical expenses he paid. The WCJ determined that due to the accident, Mr. Young was unable to earn 90% of his pre-

2

accident wages from December 10, 2020, through September 30, 2021, and awarded him SEBs in the amount of $14,761.62. The WCJ assessed penalties of $2,000 against Smitty's payable to Mr. Young and awarded Mr. Young's counsel $9,000 in attorney's fees against Smitty's for its failure to timely authorize and pay for the necessary medical care resulting from the accident. The WCJ found that Smitty's failed to establish it reasonably controverted these requests. The WCJ taxed costs of $1,334.06 against Smitty's. The WCJ determined that Mr. Young failed to carry his burden of proving that he was entitled to penalties and attorney's fees related to indemnity benefits.

Smitty's appeals from the judgment. In Smitty's first assignment of error, it contends that the WCJ erred as a matter of law in finding that Mr. Young was a credible witness. In its second assignment of error, Smitty's contends that the WCJ committed legal error in finding that Mr. Young carried his burden of proof and in awarding him SEBs. In its third assignment of error, Smitty's contends that the WCJ erred in finding that Mr. Young carried his burden of proving causation between his March 24, 2020 accident and his shoulder surgery. In Smitty's fourth assignment of error, it contends that the WCJ erred as a matter of law in finding that Smitty's did not reasonably controvert Mr. Young's entitlement to medical benefits. In its fifth assignment of error, Smitty's contends that the WCJ erred in awarding SEBs from December 10, 2020, until September 30, 2021, without any medical evidence to support a finding of disability during this time.

Mr. Young answered the appeal, contending that there is a clear lack of legal and factual support for Smitty's appeal and seeking the attorney's fees he incurred in responding.

3

## STANDARD OF REVIEW

Factual findings in a workers' compensation case are subject to the manifest error or clearly wrong standard of appellate review. **Shelton v. Smitty's Supply, Inc.**, 2017-1419 (La. App. 1 Cir. 6/12/18), 253 So.3d 157, 163, writ denied, 2018-1195 (La. 11/14/18), 256 So.3d 258, and writ denied, 2018-1199 (La. 11/14/18), 256 So.3d 291. An appellate court cannot set aside the factual findings of the WCJ unless it determines there is no reasonable factual basis for the findings and the findings are clearly wrong (manifestly erroneous). **Id.** If the WCJ's findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier-of-fact, it would have weighed the evidence differently. **Id.** Furthermore, when factual findings are based on the credibility of witnesses, the fact-finder's decision to credit a witness's testimony must be given "great deference" by the appellate court. **Id.** Thus, when there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, although the appellate court may feel its own evaluations and inferences are as reasonable. **Id.** Determinations as to whether the employee has discharged his burden of proof are factual determinations that should not be disturbed on appellate review unless clearly wrong or manifestly erroneous. See **Ardoin v. Firestone Polymers, L.L.C.**, 2010-0245 (La. 01/19/11), 56 So.3d 215, 219.

## TRIAL TESTIMONY AND EVIDENCE

At trial, Mr. Young testified and submitted evidence, and Smitty's submitted evidence in its case-in-chief. The parties entered into the following stipulations: that Mr. Young was a full-time, salaried employee of Smitty's, earning $55,000 yearly; that he suffered an accident in the course and scope of his employment on March 24, 2020; that Smitty's paid for two visits for him at Cypress Pointe Urgent Care (Urgent

4

Care); and that he received unemployment compensation from June 5, 2020, the date his employment with Smitty's was terminated, until December 9, 2020.

Mr. Young testified that he was working as a "lead in inventory" for Smitty's, overseeing a crew of five or six employees, and that his job entailed moving products from one dock to another and preparing them for shipping, unloading, and counting, and replenishing the racks with inventory.[1] The boxes involved could weigh from twenty to forty pounds. On March 24, 2020, the date of the accident, Mr. Young was fifty-four years old and weighed about 300 pounds. He testified that the accident occurred when he slipped and fell, landing on his right shoulder, whereupon he immediately felt "a lot of pain" and had problems moving his shoulder. Mr. Young reported the unwitnessed accident to other employees, and a Smitty's employee brought him to Urgent Care. The records from Urgent Care introduced as evidence showed that his chief complaint was right shoulder pain, which worsened when he raised his right arm forward and to the side. The x-rays of Mr. Young's shoulder taken the same day showed no fracture or acute bone/joint abnormality. Nurse practitioner Brandie Smith gave him pain pills, scheduled a follow-up visit for March 31, 2020, and released Mr. Young to return to regular duty work.

According to Mr. Young, he returned to work the next day and tried to do his job, but "wouldn't do as much from then on because of what [he] was suffering." Mr. Young testified that the pain was constant, "[s]trength-wise, movement-wise." He stated that he was able to scan, drive a forklift, answer and send emails, attend safety meetings, back trucks in, and get workers to move trucks and trailers around, but he was unable to do the physical part of the job.

---

[1] Mr. Young's personnel records with Smitty's indicate that he started his employment there on June 15, 2018.

On March 31, 2020, Mr. Young had a telehealth visit at Magnolia Clinic, his primary care clinic, due to pain and a decreased range of motion in his right shoulder. The records from Magnolia Clinic show that his condition was assessed as shoulder pain for which he was prescribed pain medication. Mr. Young testified that Magnolia Clinic gave him phone numbers for orthopedic specialists, but when he called, they wouldn't see him because he had a work injury.[2]

On April 6, 2020, a Smitty's employee brought Mr. Young for his follow-up visit at Urgent Care. According to Mr. Young, his symptoms had increased. Mr. Young testified that he was examined, his previous x-rays were reviewed, and he was told "it was all in [his] head." Mr. Young asked if an MRI could be done, but Urgent Care again released him to return to regular duty work.

Mr. Young testified that he did go back to work, but that after the date of the accident, "I was in constant pain. So, when you ask me how [his shoulder] feels, every day, every single day, you just deal with it, you know. You just do what you gotta do." When asked how it affected his life at home, Mr. Young testified that "[y]ou learn to live with it." He stated that the biggest problem was sleeping in a bed and that pain pills did not help. When Mr. Young was asked what, if any, changes he made to his regular work routine due to his right shoulder pain, he answered, "I don't think I made any changes. I just did what had to be done. You just do it. You work through it, you know. I wasn't gonna –I love being there. I wasn't gonna let nothing interfere." He testified that he did not miss any work due to his right shoulder pain. According to Mr. Young, he could not reach above his head with his right arm, but he could still drive a forklift. He was scheduled for a follow-up appointment at Urgent Care on April 12, 2020, but he did not go.

---

[2] Mr. Young testified that when he told his boss at Smitty's he was going to be late for work because he was trying to find a doctor, he was told if he needed a doctor he had to tell "them" because "[y]ou can't go to the doctor on your own."

6

On June 5, 2020, Smitty's terminated Mr. Young's employment. The reason for the termination listed in his personnel records was "Employee has displayed acts of insubordination and work performance has been dissatisfactory." Mr. Young denied that he had been insubordinate and testified that he clocked out early on June 4, 2020, against his supervisor's directive because he had worked through lunch. Before his termination, Mr. Young had been the subject of a complaint, a reprimand, and a performance appraisal in January, February, and March of 2020.[3] After he was terminated, Mr. Young received unemployment compensation until December 9, 2020, with an additional unemployment check in February of 2021. During that time, he applied for jobs that he thought he could do.

On June 16, 2020, Mr. Young returned to Magnolia Clinic, and he was again referred to an orthopedic clinic. Mr. Young testified that although he believed he could not see a doctor he chose, the pain had become unbearable, and he wanted to see a doctor before his health insurance ended. On June 17, 2020, Mr. Young saw Dr. Bryan G. Frentz, a board-certified orthopedic surgeon, at Southwest Mississippi Regional Medical Center. Mr. Young offered Dr. Frentz's deposition into evidence at trial. Dr. Frentz testified that Mr. Young complained of bilateral shoulder pain, with the right shoulder more symptomatic than the left. According to Dr. Frentz, Mr. Young said that the symptoms started after a fall "four months ago" when he fell directly on his right shoulder. Mr. Young told Dr. Frentz that he had pain with overhead activity and lying on his right shoulder and less severe left shoulder pain. Dr. Frentz examined Mr. Young and initially diagnosed Mr. Young with right

---

[3] In January of 2020, six employees supervised by Mr. Young filed a Human Resources complaint about him, and in February of 2020, a Personnel Action Form was completed reprimanding Mr. Young for using a cell phone while operating a forklift. On March 20, 2020, Mr. Young received an email from his supervisor dealing with receipts that were not verified and scanned, which was "unacceptable."

7

shoulder bursitis, testifying that "the signs and symptoms of bursitis can be similar or the same as a tear in the rotator cuff tendon, but I don't put the diagnosis of rotator cuff tendon tear until I see it on [an] MRI scan."[4] Dr. Frentz explained that his usual protocol was to treat the shoulder with an injection, with or without physical therapy. Then, if the patient did not improve, he would order an MRI to determine if there was a rotator cuff tendon tear "and not just bursitis." He explained that bursitis was usually caused by trauma or repetitive activity. Dr. Frentz injected cortisone into the subacromial space in Mr. Young's right shoulder. At his follow-up appointment on July 1, 2020, Mr. Young reported that he continued to have pain with overhead activity and had no improvement after the injection, so Dr. Frentz ordered an MRI.

Mr. Young began working for McComb Diesel, Inc., on February 11, 2021, for forty-four hours per week at $14.50 per hour, and after May 13, 2021, earning $15 per hour.[5] Mr. Young testified that when he applied for the job, "I explained to them when I came in, because I didn't want no issues, and told them I had a shoulder injury and I'm limited." Mr. Young testified that the work was mostly performed on the desktop computer, and that he had pain daily. Mr. Young stated that he obtained health insurance though McComb Diesel in June 2021 and resumed getting medical treatment for his shoulder.

Mr. Young saw Dr. John Berry, an orthopedist with Southern Bone & Joint Specialists, P.A., on August 27, 2021.[6] The medical records from Dr. Berry show

---

[4] When he examined Mr. Young, Dr. Frentz noted pain with forward flexion greater than 90 and abduction greater than 80; a positive Hawkins, a positive Neer, and a positive impingement sign; and his supraspinatus strength was four out of five.

[5] Mr. Young submitted a payroll summary from McComb Diesel indicating he worked from February 18, 2021, until August 12, 2021.

[6] Dr. Berry's history noted that Mr. Young slipped and fell at Smitty's, landing on his right shoulder. The history further stated that Mr. Young was seen by "someone in McComb," probably not an orthopedic surgeon, and was told he had no issue. According to the history, Mr. Young went to an orthopedic surgeon at his own expense, but because it was not covered by workers'

8

that after examining Mr. Young and reviewing x-rays of his shoulders, Dr. Berry thought he had a right rotator cuff tear and ordered an MRI.[7]

Mr. Young was not able to have the MRI of his right shoulder until September 7, 2021, after he had obtained health insurance with McComb Diesel. Mr. Young testified that he had previously offered to pay for the MRI himself, but Dr. Frentz could not accept his personal payment. According to Dr. Frentz, the MRI showed "advanced osteoarthritis, full thickness tearing of the supraspinatus tendon and infraspinatus tendon with retraction, muscular atrophy, a large joint effusion, and effusion extending into the biceps tendon sheath."

On September 10, 2021, Dr. Berry saw Mr. Young and reviewed the MRI. He assessed Mr. Young with the following: a complete tear of the right rotator cuff, synovitis of the right shoulder, and a tear of the right glenoid labrum. In his notes of the visit, Dr. Berry listed as his "Impression": right shoulder massive rotator cuff tear, glenohumeral arthrosis, biceps tendinopathy, superior labrum tear, global synovitis, and effusion. Dr. Berry prescribed medication and recommended different surgical options to repair Mr. Young's right shoulder. He noted that Mr. Young had reported no prior history of an issue with his right shoulder until the March 2020 slip and fall and stated that Mr. Young's delay in treatment impacted his treatment options and made them "somewhat difficult due to the time frame of this injury." Dr. Berry concluded that the injury had "some relative acuity to it" based on Mr. Young's history, symptoms, and "very minor muscle atrophy for

---

compensation, he could not continue treatment. Mr. Young also complained of night pain and left shoulder pain that had worsened over the past year.

[7] According to Dr. Berry's records, when Dr. Berry examined Mr. Young, his right shoulder had an active range of motion of 100, forward flexion/abduction of 90, external rotation of 75, and internal rotation low L-spine. He had positive Neer's, Hawkins, empty can, and Whipple testing. His left shoulder had an active range of motion to 150 degrees, albeit slow, with an abduction of 90 and internal/external 70 degrees with some pain with resistance but rotator cuff strengthening of 4+/5.

9

something that would be more consistent with an injury around about the time that he reports in March 2020."

On September 28, 2021, Dr. Frentz saw Mr. Young and noted deterioration in his range of motion and a continuation of positive Hawkins, Neer, and impingement signs. Among other conclusions, Dr. Frentz thought that Mr. Young would benefit from right shoulder arthroscopy to examine the rotator cuff and determine if it was reparable. Dr. Frentz attributed Mr. Young's shoulder injuries and related medical care to the March 24, 2020 accident. In his treatment record, Dr. Frentz stated, "Patient's fall likely resulted in this constellation of injuries and the long delay in treatment has likely caused the retraction and muscle atrophy." During his deposition testimony, Dr. Frentz confirmed his opinion that it was more likely than not that the fall caused Mr. Young's "constellation of injuries." When asked if his opinion on causation was based on the history given by the patient, which in this case was that he was asymptomatic prior to the fall, Dr. Frentz replied affirmatively.

On November 1, 2021, Dr. Frentz performed surgery on Mr. Young's shoulder, which was paid for by Mr. Young's health insurance. Dr. Frentz testified that the surgical examination confirmed the MRI findings and that Mr. Young had a "large full thickness rotator cuff tendon tear with the retraction, and ... an intrasubstance biceps tendon tear. So we performed an arthroscopy with rotator cuff tendon repair and a tenotomy of the biceps tendon." Dr. Frentz agreed that the surgery was medically necessary as a result of the injuries Mr. Young sustained in the March 2020 work accident. According to Dr. Frentz, the surgery was successful and he referred Mr. Young to physical therapy.

On November 16, 2021, Dr. Frentz saw Mr. Young, and he reported a "marked improvement in pain since surgery." Mr. Young was in outpatient therapy and wanting to return to work. He had a full active and passive range of motion, no

10

tenderness, and was neurovascularly intact. Dr. Frentz concluded that after Mr. Young completed his physical therapy, he could return to full-duty work. The November 18, 2021 records from Mr. Young's physical therapy state for his history, "he was in pain constantly for 1/1/2 y[ea]rs. Now, he has no pain." At trial, Mr. Young was asked about his testimony that he was in pain from the date of the accident, and he answered that the pain stopped after he had surgery. Mr. Young was also asked whether he had been involved in any other accidents or injuries involving his right shoulder between March 24, 2020, and the date of his surgery, to which he replied, "No." On December 15, 2021, Dr. Frentz released Mr. Young to return to work with no restrictions.

At trial, Mr. Young was asked about a prior injury that occurred on November 8, 2018. He testified that while moving a drum on Dock 6, he heard something pop in his left bicep. According to Mr. Young, he reported the incident and then went to the doctor Smitty's sent him to who x-rayed the arm and saw him a few times. Mr. Young testified that his arm "just healed" and he had no additional problems with his bicep.

## ASSIGNMENTS OF ERROR NUMBERS ONE AND THREE
### CREDIBILITY AND CAUSATION

In its first assignment of error, Smitty's contends that the WCJ erred in finding that Mr. Young was a credible witness. Smitty relies on the jurisprudence holding that where documents and objective evidence so contradict a witness's story or the story itself is so internally inconsistent or implausible on its fact that a reasonable factfinder would not credit the witness's story, the reviewing court may well find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. See **Hanks v. Entergy Corp.**, 2006-0477 (La. 12/18/06), 944 So.2d 564, 580. In Smitty's third assignment of error, it contends that the WCJ erred in

11

finding that Mr. Young proved causation between the accident and his shoulder surgery, performed more than a year and eight months later.

In contending that Mr. Young was not credible, Smitty's argues that Mr. Young's shoulder injury did not prevent him from working because Urgent Care released him to return to work at both appointments after the accident, and Mr. Young did not miss any work between the date of the accident and his termination. Smitty's also alleges that Mr. Young did not seek further medical treatment between April 4, 2020, and June 4, 2020, and he missed his second follow-up appointment at Urgent Care. Additionally, Smitty's notes that Mr. Young received a reprimand, a complaint, and a critical email regarding his work performance prior to the accident, culminating in his termination less than three months after the accident. Smitty's then notes that after his termination, Mr. Young texted the Smitty's employee in charge of firing and hiring asking for "another chance." Moreover, it contends that when Mr. Young applied for unemployment benefits after his termination, he verified that he was ready, willing, and able to perform to work and looking for employment.

Smitty's also argues that Mr. Young made numerous misrepresentations about his pre-existing right shoulder pain and medical treatment for a year and a half prior to the accident. The medical records from Mr. Young's primary care clinic, Magnolia Clinic, show that at his checkups, which were apparently for hypertension, Mr. Young had right shoulder pain under the diagnosis section of the record on December 3, 2018, and July 12, 2019, and under the billing and medical history sections on August 9, 2019.[8] The December 3, 2018 record contained language in

_____

[8] The Magnolia Clinic medical records do contain references to shoulder pain as part of Mr. Young's past medical history, but they do not specify whether it was the right or left shoulder (September 20, 2019; October 23, 2019; November 1, 2019; November 8, 2019; December 19, 2019; February 10, 2020; February 13, 2020).

12

the assessment and plan section indicating that Mr. Young needed to follow up with an orthopedist, but that he refused and would take Ibuprofen that the clinic prescribed. After the accident at issue in this suit, on March 31, 2020, the assessment note states "Shoulder pain ... Pain in joint, shoulder region started 9 Aug. 2019." However, the medical record from that appointment also states, "[patient] states fell approx[imately] 1 w[ee]k ago and now presents with r[ight] shoulder pain and decreased rom [(range of motion)]." According to the record, "Patient presents for evaluation of new onset symptoms. Condition is reported to have developed acutely." The record also notes as an objective finding that Mr. Young's right arm had a decreased range of motion and pain with range of motion. At the June 16, 2020, June 23, 2020, and November 6, 2020 visits, the records show that Mr. Young continued to have issues with his right shoulder and that he had a decreased range of motion and pain with range of motion. While the medical records contain a prior medical history of right shoulder pain, they do not indicate that Mr. Young was seeing the clinic primarily for his right shoulder pain, that it was disabling, or that there were objective findings as to the right shoulder until after the March 24, 2020 injury.[9]

Smitty's contends that Mr. Young failed to indicate that he had treatment for a prior neck injury on his Post-Hire Medical History Questionnaire. Contrary to Smitty's contentions on appeal, the WCJ did address the prior neck injury and the pre-existing right shoulder issue in her reasons for judgment. The WCJ in the judgment and her reasons for judgment considered Mr. Young's prior neck injury in the context of La. R.S. 23:1208.1, which provides for an employee's forfeiture of

---

[9] Smitty's introduced into evidence Mr. Young's medical records from Amite Rural Health Clinic (Clinic), which show he visited the Clinic several times for an injury that occurred when he was lifting a pallet at Smitty's and then felt a right shoulder strain on November 8, 2018.

13

workers' compensation benefits if the employee fails to answer truthfully about a previous injury, disability, or other medical condition on an employer's medical questionnaire where the failure to answer directly related to the medical condition for which a claim for benefits is made.[10] However, Smitty's did not raise the forfeiture of benefits as an issue in its pleadings. On cross-examination, Smitty's questioned Mr. Young about his Post-Hire Medical History Questionnaire to show that Mr. Young lacked credibility because he failed to indicate he had a prior neck injury. Mr. Young admitted that he had been in a bad accident in Chicago in 1988 where he sustained a C-7 neck injury requiring at least a week of hospitalization and resulting in his inability to work and ensuing litigation. When asked why he had not indicated the prior neck injury, he testified that he "probably didn't remember" and he had no neck pain when he completed the questionnaire. Out of an abundance of caution, Mr. Young discussed the issue of La. R.S. 23:1208.1 fraud in his post-trial memorandum. In her reasons for judgment, the WCJ concluded:

> that Smitty's failed to show that Mr. Young's unrelated neck issues or his shoulder osteoarthritis made Mr. Young's right shoulder injury "inevitable or very likely to occur." Nor did Smitty's show that Mr. Young's pre-existing conditions merged with his two torn tendons in his rotator cuff to create a greater disability.

(Footnotes omitted.)

The WCJ cited **Nabors Drilling USA v. Davis**, 2003-0136 (La. 10/21/03), 857 So.2d 407, 414-15, which held that an employer must incur prejudice from the false

---

[10] *The judgment states that Smitty's "failed to carry its burden to demonstrate that Mr. Young violated Louisiana Revised Statute 23:1208.1 for his claimed shoulder injuries." Louisiana Revised Statutes 23:1208.1 provides, in pertinent part:*

> Nothing in this Title shall prohibit an employer from inquiring about previous injuries, disabilities, or other medical conditions and the employee shall answer truthfully; failure to answer truthfully shall result in the employee's forfeiture of benefits under this Chapter, provided said failure to answer directly relates to the medical condition for which a claim for benefits is made or affects the employer's ability to receive reimbursement from the second injury fund.

14

statement for forfeiture under La. R.S. 23:1208.1 to apply, which can require the employer to establish that the newer injury was inevitable or very likely to occur because of the presence of the pre-existing condition. Smitty's argues that it was not raising the prior neck injury to have Mr. Young forfeit his benefits under La. R.S. 23:1208, but to show that Mr. Young was not credible.

As to Mr. Young's pre-existing right shoulder issues, the WCJ in her reasons for judgment stated that even though Mr. Young had been seen at Magnolia Clinic in August of 2019 for a pre-existing issue with his shoulder, he was able to perform his job duties prior to the 2020 accident. She stated that "Not until the work-related accident did Mr. Young have the disabling issues with his right shoulder and arm." Mr. Young's testimony was that he had healed from his prior shoulder injury. Mr. Young's testified several times that he "loved" his job and that despite his injury, he continued to work in pain. His testimony also indicated that the 2020 injury was much more significant than any prior issues he had. Mr. Young testified that with his weight of about 300 pounds and the way he fell on his shoulder, "That's why I kept asking for help. Something is wrong with me to suffer like that." The WCJ noted that Urgent Care recorded Mr. Young's limitation to his shoulder almost immediately after the accident and also noted that both Dr. Berry and Dr. Frentz related Mr. Young's right shoulder issues to the work-related accident. The WCJ noted that there was no evidence to contradict the doctors' opinions on causation.

Smitty's contends that Dr. Frentz's and Dr. Berry's opinions on causation should not be considered because they were based on an incorrect history. At trial, Smitty's questioned Mr. Young about the history he had given to Dr. Frentz and Dr. Berry about his right shoulder pain beginning after the March 2020 accident, and Mr. Young admitted that this history was not correct. Smitty's had also asked Dr.

15

Frentz whether, if the history given by a patient was incorrect, then his opinion on causation would be incorrect, to which Dr. Frentz replied affirmatively.[11]

We note that Mr. Young's pre-existing issues with his right shoulder do not bar him from recovery of benefits when the accident aggravated, accelerated, or combine with the disease or infirmity to produce disability for which compensation is claimed. A pre-existing disease or infirmity of an employee does not disqualify a workers' compensation claim if the work-injury aggravated, accelerated, or combined with the disease or infirmity to produce death or disability for which benefits are claimed. **Shelton**, 253 So.3d at 168. A disabled employee must prove that before the work-related injury he had not manifested disabling symptoms, but that commencing with the work-injury, the disabling symptoms appeared and there is either medical or circumstantial evidence indicating a reasonable possibility of causal connection between the work-injury and the activation of the disabling condition. **Id.**

The WCJ considered all of the evidence presented concerning Mr. Young's work history and noted that, although Mr. Young had previously been treated in August of 2019 for a pre-existing right shoulder issue, he was able to perform his job duties. We cannot say that the WCJ erred in determining that Mr. Young was a credible witness and therefore, was not manifestly wrong in awarding medical benefits. We also cannot say that the WCJ erred in finding that Mr. Young met his burden of proving that there was a causal connection between the accident and the shoulder surgery. For the foregoing reasons, Smitty's first and third assignments of error have no merit.

---

[11] We note that the medical records from Mr. Young's June 17, 2020 visit to Dr. Frentz contain the following: "**CHIEF COMPLAINT** CO BILATERAL SHOULDER PAIN; STATES HURT LEFT ARM IN 2018; RIGHT ARM FELL MARCH 24-20 ONTO RIGHT SHOULDER; TOLD NOTHING WRONG AND HAS BEEN FIRED; WORSE AT NIGHT; CAN'T RAISE."

16

## ASSIGNMENT OF ERROR NUMBER FIVE
## SUPPLEMENTAL EARNINGS BENEFITS (SEBs)

In its second assignment of error, Smitty's contends that the WCJ committed legal error in finding that Mr. Young met his burden of proof and awarding him SEBs. The purpose of SEBs is to compensate the injured employee for the wage-earning capacity he lost as a result of his accident. **Banks v. Industrial Roofing & Sheet Metal Works, Inc.,** 96-2840 (La. 7/1/97), 696 So.2d 551, 556. An employee is entitled to receive SEBs if he sustains a work-related injury that results in his inability to earn 90% or more of his average pre-injury wage. See La. R.S. 23:1221(3)(a); **Poissenot v. St. Bernard Parish Sheriff's Office,** 2009-2793 (La. 1/9/11), 56 So.3d 170, 174. Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount. If the employee satisfies that burden of proof, the burden shifts to the employer to prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employee's community or reasonable geographic location. See La. R.S. 23:1221(3)(c)(i); **Poissenot,** 56 So.3d at 174. A claimant is not entitled to SEBs when his inability to earn wages equal to 90% of his pre-injury wages is due to circumstances other than his work-related injury. **Hurst v. Baker Sand Control,** 94-2463 (La. App. 1 Cir. 10/6/95), 671 So.2d 408, 412.

The burden of proof does not shift to the employer merely because an employee proves he is unemployed at the time of trial or unable to obtain the same type of job as before the accident. **Poissenot,** 56 So.3d at 178. The WCJ must consider all factors which might bear on an employee's ability to earn a wage in determining whether the injured employee has met his burden of showing an

17

inability to earn 90% of his pre-injury wages, including factors such as the employee's medical condition, efforts at obtaining employment post-injury, and actual work history after the accident. **Arretteig v. Our Lady of the Lake Hospital, Inc.**, 2013-1603 (La. App. 1 Cir. 3/21/14), 142 So.3d 1048, 1051-52. Whether a claimant has carried his burden of proof is a question of fact subject to the manifest error or clearly wrong standard of appellate review. See **Poissenot**, 56 So.3d at 174; **Batiste v. Tenet Healthcare Corp.**, 2009-1192 (La. App. 1 Cir. 2/12/10), 35 So.3d 352, 354, writ denied, 10-0559 (La. 5/7/10), 34 So.3d 864.

In awarding Mr. Young SEBs, the WCJ stated that after the work accident, Mr. Young testified that he could not perform his regular job duties at Smitty's without modification or assistance. She noted that Mr. Young sought unemployment benefits after his employment at Smitty's was terminated, and that he was not entitled to indemnity benefits for that period. The WCJ determined that although Mr. Young certified that he could work by filing for unemployment benefits, he needed a job that accommodated his shoulder injuries. The WCJ then stated, "While the record is absent comment from the medical providers after December 2020 about Mr. Young's ability to work, the records show distinct and objective physical limitations associated with Mr. Young's shoulder injury." The WCJ found that Mr. Young secured employment that accommodated his limitations. She determined that his earnings were less than 90% of his pre-injury wages and awarded him SEBs from December of 2020 through September of 2021.

Based on our review of the record, we find that Mr. Young did not meet his burden of proving that his injury resulted in an inability to earn 90% of his pre-injury wages. The only evidence supporting his inability to earn that amount was his testimony that he had to modify his job duties due to his shoulder pain. The Urgent Care records show that after the accident, he was released to work. When Mr. Young

18

was terminated by Smitty's, the evidence does not indicate it was due to his inability to do his work because of his shoulder issues. A claimant is not entitled to SEBs where his inability to earn 90% of his pre-injury wages is due to circumstances other than the work-related injury. **Hurst,** 671 So.2d at 412. Mr. Young answered affirmatively at trial, when asked, if by receiving unemployment benefits, he had to be "willing, ready, and able to perform employment." Mr. Young also did not submit medical testimony or evidence to support his inability to work at 90% of his pre-injury rate from December of 2020 until he had his surgery on November 1, 2021, after which he was released to work on December 15, 2021. Therefore, we find Smitty's assignment of error number four has merit and we reverse the WCJ's award of SEBs from December of 2020 through September of 2021.

### ASSIGNMENT OF ERROR NUMBER FOUR
### PENALTIES AND ATTORNEY'S FEES

In its fourth assignment of error, Smitty's contends that the WCJ erred in finding that it did not reasonably controvert Mr. Young's entitlement to medical benefits. An employer or insurer shall be assessed with penalties and attorney's fees for the failure to timely pay disability or medical benefits unless "the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control." See La. R.S. 23:1201(F)(2). An employer reasonably controverts a claim when it has sufficient factual and/or medical information to counter the employee's factual and/or medical information throughout the time it refused to pay all or part of the benefits allegedly owed. **Calhoun v. Sanderson Farms, Inc.,** 2022-0478 (La. App. 1 Cir. 12/16/22), 357 So.3d 354, 364. The crucial inquiry is whether the employer had an articulable and objective reason to deny payment at the time it took action. **Id.** at 364-65. The claimant bears the burden of proving his entitlement to statutory penalties and

19

attorney's fees due to the employer's failure to timely pay workers' compensation benefits. **Shelton**, 253 So.3d at 169. Whether an employer reasonably controverted a claim is a question of fact that is subject to the manifest error standard of review. **Id.** Louisiana Revised Statute 23:1201(F) is penal in nature and must be strictly construed. See **Id.**

In awarding penalties and attorney's fees, the WCJ initially noted in her reasons for judgment that Smitty's denied authorization for Mr. Young's treatment and his indemnity benefits even though the Urgent Care, which she described as Smitty's "own occupational medical clinic" verified his decreased range of motion and inability to hold his arm up above forty-five degrees. She noted that Mr. Young continued to work by modifying the physical components of his job and having co-workers assist. The WCJ pointed out that Mr. Young paid for his own physicians using his private health insurance. She stated that after his health insurance expired, he was unable to continue his treatment. The WCJ commented that because Mr. Young could not continue his treatment, his options were limited and his recovery was impacted.

The WCJ then referred to a June 22, 2020 demand letter Smitty's received from Mr. Young's counsel. The June 22, 2020 demand letter stated, "It is ... our understanding that Dr. Bryan Frentz, an orthopedic physician with offices in Lafayette and Morgan City, Louisiana, has requested an MRI for the shoulder which has been denied. Please advise as to any reconsideration of same."[12] The WCJ stated that Smitty's was put on notice of Mr. Young's ongoing need for care related to the work-place accident and had a duty to further investigate it, citing **Shelton**, 253 So.3d at 170.

---

[12] Smitty's contends that Dr. Frentz did not have offices in Lafayette or Morgan City, Louisiana. However, his curriculum vitae attached to his deposition shows that he practiced in Lafayette from 2005 to 2017 and in Morgan City from 2017 to 2020.

Smitty's contends that it was not arbitrary and capricious in its handling of Mr. Young's claim because the medical bill from Urgent Care that it did not pay had a statement date of April 27, 2022, and there was no evidence that it was ever presented with the bill. It also contends that Mr. Young stipulated that this bill was paid.[13] As to the June 22, 2020 demand letter, Smitty's contends that Mr. Young submitted no evidence to show that it submitted a request to Smitty's or its insurer for the MRI.

Where an employer or insurer initially receives a favorable medical report, but later receives information revealing the possibility of a continuing disability, it may not blindly continue to rely on the initial medical report. **Shelton**, 253 So.3d at 170. The employer or its insurer has a continuing duty to investigate and make every reasonable effort to assemble factual and medial information to ascertain whether a claim is compensable before denying benefits. **Connor v. Family Dollar Store**, 2009-1537 (La. App. 1 Cir. 3/26/10), 36 So.3d 339, 350, writ denied, 2010-0959 (La. 6/25/10), 38 So.3d 344. In this case, Mr. Young's demand letter was dated June 22, 2020, he filed his claim on July 23, 2020, and Smitty's answered the claim on August 13, 2020, denying Mr. Young's entitlement to additional medical treatment. The demand letter and the claim itself reveal the possibility of a continuing disability, and Smitty's had a continuing duty to investigate and make a reasonable effort to gather information to determine if the claim was compensable before it denied benefits. Therefore, we cannot say that the WCJ manifestly erred in assessing statutory penalties and attorney's fees against Smitty's, and it's fourth assignment of error has no merit.

---

[13] Despite the stipulation, Mr. Young testified that he had received a bill for the second Urgent Care visit indicating it had not been paid. He introduced a copy of the bill into evidence.

21

## ANSWER TO THE APPEAL
## REQUEST FOR ATTORNEY'S FEES ON APPEAL

Mr. Young answered the appeal, contending that there is a clear lack of legal and factual support for the appeal and seeking the attorney's fees he incurred in responding to the appeal. An increase in attorney's fees is usually awarded when a party appeals, obtains no relief, and the appeal has necessitated additional work by the opposing party's counsel. See **Graves v. Automated Commercial Fueling Corp.**, 2005-2561 (La. App. 1 Cir. 11/3/06), 950 So.2d 759, 765. In this case, Smitty's has obtained some relief on appeal. Therefore, we deny Mr. Young's request for additional attorney's fees on appeal.

## CONCLUSION

For the above and foregoing reasons, we reverse that part of the September 20, 2022 judgment awarding Keith Young supplemental earnings benefits in the amount of $14,761.62. In all other respects, the September 20, 2022 judgment is affirmed. We deny Keith Young's answer to the appeal requesting additional attorney's fees for this appeal. Costs of this appeal are to be split equally between Keith Young and Smitty's Supply, Inc.

**AFFIRMED IN PART; REVERSED IN PART; ANSWER TO APPEAL DENIED.**

22

KEITH L. YOUNG

VERSUS

SMITTY'S SUPPLY, INC.

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2023 CA 0092

Wolfe, J., agreeing in part and dissenting in part.

I agree with reversing the award of supplemental earnings benefits and denying the answer to the appeal. However, I disagree with otherwise affirming the judgment. Based on Mr. Young's untruthful medical answers and his ongoing right shoulder treatment before the accident at issue, I would reverse the judgment in its entirety.